## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**WHITNEY CHASE,**

      **Plaintiff,**

**vs.**                     **CASE NO.: 4:24-CV-228-RH-MAF**

**FLORIDA FISH AND WILDLIFE**
**CONSERATION COMMISSION ,**

      **Defendant.**

_____/

## AMENDED COMPLAINT

Plaintiff, WHITNEY CHASE, hereby sues Defendant, FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION, and alleges:

### NATURE OF THE ACTION

1.    This is an action brought under the Florida Civil Rights Act, codified at Chapter 760, Florida Statutes and 42 U.S.C. §2000e et seq.

2.    This action involves claims which are, individually, in excess of Fifty Thousand Dollars ($50,000.00), exclusive of costs and interest.  This case was removed to this Court by the Defendant.

### THE PARTIES

3.    At all times pertinent hereto, Plaintiff, WHITNEY CHASE, has been a resident of the State of Florida and was employed by Defendant. Plaintiff is a

member of a protected class due to her gender and she was retaliated against after reporting Defendant's unlawful employment practices.

4.     At all times pertinent hereto, Defendant, FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION, has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5.     Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE ULTIMATE FACTS

6.     Plaintiff, a female, began her employment with Defendant in August 1998 and currently holds the position of Investigator.

7.     Despite her stellar work performance during her employment with Defendant, Plaintiff has been subjected to disparate treatment, different terms and conditions of employment, and was held to a different standard because of her gender, and because she reported Defendant's unlawful employment activities and was subject to retaliation thereafter. She has also been subjected to a hostile work environment based on her gender.

8.     The disparate treatment, hostility and retaliation came at the hands of specifically but not limited to Captain John Wilke, Major Jay Russel, Acting Captain Ben Eason, and Captain Herbert Frerking, all males.

9.     Plaintiff began working for Defendant's predecessor, the Florida Department of Environmental Protection.

10.    Plaintiff is a loyal, dedicated and industrious employee and has worked for Defendant for over twenty-five years.

11.     Plaintiff has been and continues to be treated less favorably than co-workers outside her protected class, female, including specifically but not limited to: Lieutenant Maxwell Edson, Lieutenant William Ward, Ben Eason, and Lieutenant John West, all males.

12.    In September 2016, Plaintiff was promoted to Lieutenant. Wilke was a Lieutenant at that time and was not Plaintiff's supervisor.  Frerking was Plaintiff's Captain, her supervisor, at the time of her promotion.

13.    In 2017, Frerking criticized Plaintiff about the lack of nights and weekends she worked. However, Plaintiff worked more nights and weekends than Lieutenant Steve Van Nortwick, a male, Lieutenant Stacy Baer, a male, and Eason. Moreover, these officers were not admonished for not working enough nights and weekends.

14.    In 2017, Frerking frequently and routinely spoke to Plaintiff in a hostile, agitated, and condescending manner.  His tone and demeanor suggested that Plaintiff was not worthy of the promotion and that he did not have time for her.

15.    In 2017, Frerking was speaking to another Captain, Joe Brooks, in front of a group of Officers, including male Officers Joe Wolff and Michael Scinta. Frerking told the group that Plaintiff was not a good supervisor. Plaintiff learned about this conversation from Wolff.

16.    Throughout 2017, Frerking would call Lieutenant William Ward, a male, and Eason to check on them and give them advice. However, Frerking never called Plaintiff to check in nor to give her advice.

17.    On July 27, 2017, Plaintiff was issued a documentation of oral counseling from Frerking for failing to operate her assigned vehicle in a safe manner. That day, she crossed over the yellow line on a two way highway trying to locate an area on the computer as she was new to the geographical area. Male officers, including specifically but not limited to Officer Mario Bertalomi have received complaints about speeding and driving issues, and have damaged vehicles and vessels in accidents and received red light camera violations but they have not been given a documentation of oral counseling or other discipline. Colin Hocker and Eric Fletcher hit trees with their vehicles causing vehicle damage and they were not disciplined.

18.   Between 2017 and November 2021, no other letters of counseling were given to Plaintiff but Frerking continued to talk down to Plaintiff, ignore her and criticize her unjustly for her work.

19.   In November 2021, Wilke was promoted to the position of Captain and Plaintiff's   difficulties   heightened   within   Defendant   thereafter. While under Wilke, she was targeted with negative evaluations, constantly talked down to, repeated threats of demotions, scrutinized for her Target Enforcement Action (TEA) Forms, and held to a different standard than other male Lieutenants, Edson, Ward, Eason, and West, all of whom report directly to Wilke, like Plaintiff, but these males have not been targeted with negative evaluations, nor are they talked down to, nor have they had repeated threats of demotions and their TEA forms are not scrutinized.

20.   Between November 2021 and May 2023, Plaintiff's squad covered more calls for service in the extended area of the Ocala National Forest than West's and Edson's squads. However, Plaintiff was scrutinized by Wilke more than other male Lieutenants and he falsely accused her of not performing her job duties and not knowing her area.  Wilke also rode with Plaintiff's officers on a regular basis but did not do the same for male Lieutenant officers and scrutinized Plaintiff's officers work more thoroughly.  He also allowed certain TEA employees on the male Lieutenant's

shifts to work varying shifts but he was rigid regarding Plaintiff's TEA employees and did not allow them to work varying shifts.

21.    Wilke also watched Plaintiff's body camera video on one occasion to try to concoct false charges against her and he falsely accused her of being a liability to Defendant.  He did not watch body cam videos for male Lieutenants, including but not limited to Lieutenants Garret Mendelson, Edson, Ward, Eason, and West.

22.    Wilke also targeted Plaintiff for discipline but did not target male Lieutenants, Edson, Ward, Eason, and West, for discipline. Wilke actually went to a citizen to try to convince him to complain about Plaintiff but the citizen refused.

23.    In 2022, Plaintiff was assigned to a larger geographical area than male Lieutenants in an attempt to target her for reprimands. She was assigned the Ocala National Forest on addition to Lake and Sumpter Counties, much larger areas than the male Lieutenants.  Although Plaintiff was supposed to have additional officers to work this expanded area, she did not which put a significant burden on Plaintiff. Wilke was waiting on Plaintiff to fail and questioned Plaintiff about her ability to do her job.

24.    Wilke also called male Lieutenants, including but not limited to Edson, Ward, Eason, Mendelson, and West, to check up on them and meet up with them on a regular basis but did not call Plaintiff to check in and did not meet with Plaintiff

on a regular basis other than to yell at her.  Every time that Wilke met with Plaintiff it was to falsely criticize her for doing something wrong, which she had not done.

25.    Male Lieutenants, including but not limited to Edson, Ward, Eason, Mendelson, and West, were given positive feedback and told how they are doing by Wilke, but Plaintiff was not told how she was doing and was not given feedback other than false criticisms of her performance.  When she asked Wilke how she was doing in her position, he said "I can't answer that" or words to that effect and would then give her negative feedback in writing on her quarterly reports.

26.    On February 24, 2022, Wilke asked Plaintiff about a rumor he had heard about her wanting to demote herself. Plaintiff explained she did want to demote in two years when Investigator Rick Brown, a male, retired to Captive Wildlife or that she wanted to make a lateral move to Investigation Lieutenant. Wilke asked Plaintiff if she would consider an Investigator I position. Plaintiff replied "no."

27.    On March 18, 2022, Plaintiff told Wilke she felt like he was out to get her, and Wilke's response was for Plaintiff to trust him.

28.    On March 21, 2022, Wilke questioned Plaintiff about why she dropped off an off duty check. Wilkes said the conversation would be much different if Plaintiff went there just to drop the check off and had the permission to do so from administration staff. Plaintiff normally mailed duty checks in compliance with

policy but had been on site and it was convenient to simply drop off the off-duty check.

29.    In March 2022, Plaintiff asked Wilke via email if he would entertain getting a Bimini top for a boat. Wilke told Plaintiff sure and for her to get him a quote.

30.    On April 27, 2022, Wilke emailed Plaintiff and criticized her for not getting him a quote on a bimini top quick enough and also for an "unprofessional email." Plaintiff called Wilke and Wilke complained that Plaintiff had not gotten him a quote and told Plaintiff that she was not what he wanted on his leadership team and ordered Plaintiff to demote to Investigator I. Plaintiff asked "why" and Wilke said because of the Bimini top email and said that in an email Plaintiff was unprofessional. Plaintiff asked Wilke if he was out to get her and Wilke said she "would do it" to herself. Plaintiff replied that Investigator I was not where she wanted to be and wanted to keep her pay. Wilke told Plaintiff he would talk to Russel. Plaintiff did not have a deadline on the quote for the bimini top for the boat and she was not unprofessional in the email but had been persistent in following up on a request in order to ensure her officer's safety and to mitigate Defendant's liability. Lieutenant West's, a male, and Lieutenant William Ward's, a male, boats had broken bimini tops and they were not reprimanded for not getting quotes in a timely manner by Wilke and were given more time to secure quotes. Wilke harassed

Plaintiff for not getting a quote fast enough but he did not harass West and Ward about getting a quote faster.

31.    On May 24, 2022, Plaintiff met with Wilke. Wilke told her that he was not happy about how Plaintiff had handled an investigation and falsely accused Plaintiff of not being a part of the team and said that other Lieutenants did not get along with Plaintiff. Wilke again told Plaintiff she should demote. Plaintiff asked if Wilke had spoken to Russel about her pay staying the same if she demoted to Investigator I. Wilke said they would not keep her pay the same if she demoted. Plaintiff again asked Wilke if he was out to get her. Wilke said "you're going to do it to yourself".

32.    Wilke said he would have already turned "it" over to Captain Barry Shaw if he was out to get her. Wilke told Plaintiff she was the problem. Plaintiff replied and said she did her job, followed timelines and had her reports in on time. Plaintiff said she would try to trust Wilke.

33.    On May 26, 2022, Plaintiff met with all the other lieutenants and asked them if they had a problem with her and did not like her. Eason told Plaintiff that they were mad at her because the summer before under Captain Byron Smith, Plaintiff had told Smith it was not fair that she had to make a schedule for the Withlacoochee River when other Lieutenants with busier rivers did not have to make schedules which resulted in all Lieutenants having to make schedules for their rivers.

34.  That same day, Wilke told Plaintiff again that she needed to demote because she was emotional.

35.  After Plaintiff had been on vacation for two weeks, on June 30, 2022, Plaintiff called Wilke and asked how Officer Brandon Scrambling, a male, was doing acting in Plaintiff's position while she was gone. Wilke asked if she had spoken to Lieutenant Steve Zukowsky, and stated that Plaintiff needed to demote before the same thing happened to her. Wilke told Plaintiff he did not want her ending her career like Zukowsky did and said Plaintiff needed to be in the best position for her. At the time, Zukowsky was undergoing an internal affairs investigation (IA) for failing to report a sexual harassment complaint and was on administrative leave. Plaintiff asked Wilke how she was doing and Wilke said "I will not qualify that with an answer." Plaintiff contends that Wilke was threatening her with an IA investigation if she did not demote.  Male lieutenants, including but not limited to Edson, Ward, Eason, and West, were told how they were doing, given feedback and not threatened with an IA investigation.

36.  Wilke also asked Plaintiff about her workers compensation injury she sustained in 2014 and asked if Plaintiff could perform her duties. Plaintiff responded that "yes", she could and told Wilke she had no restrictions and had passed her Physical Agility Test (PAT). Wilke then asked Plaintiff two more times if she could perform her duties and also asked if she could rush into a scene. Male Lieutenants,

including but not limited to Edson, Ward, Eason, and West, were not questioned about the performance of their duties and Eason failed his PAT and was still not interrogated about whether he could perform his duties.

37.     Wilke also frequently went directly around Plaintiff to one of her officers, William "Jackson" Teal, a male, instead of involving Plaintiff in the communication which contravened chain of command. Wilke and Teal cut Plaintiff out of conversations related to her area of responsibility on a regular basis which impacted Plaintiff's ability to perform her job duties. Wilke did not circumvent the chain of command with any male Lieutenants nor were they left out of matters involving their geographical areas.

38.     On July 4, 2022, at a scene, Officer Ray Cybula, a male, spoke to Wilke and Wilke told him how he would help new lieutenants and provide them with books to become better leaders and supervisors. After the scene was cleared, Plaintiff asked Wilke how she did at the scene. Wilke sarcastically gave Plaintiff a thumbs up and said "great job." Plaintiff asked how she was doing as a supervisor because evaluations were coming up. Wilke said he did not know about that stuff and had not looked it over yet.

39.     On July 11, 2022, Plaintiff met with Russel to report the unfair treatment and harassment she experienced by Wilke. Plaintiff reported to Russel that she was reprimanded by Wilke for not getting a quote fast enough for the bimini top

and not being professional in one email. Plaintiff reported discrimination and harassment in the workplace. Russel made excuses for Wilke's behavior. Russel also falsely accused Plaintiff of denying Wilke a meeting and being insubordinate. Plaintiff told Russel she was never insubordinate and did not deny Wilke a meeting but had asked to have her Fraternal Order of Police (FOP) representative present at the meeting and that Wilke had told Plaintiff she can't have an FOP present unless it's an IA investigation.

40.   On August 5, 2022 Plaintiff met with Wilke and Administrative Assistant Tamara Akers was also present. Wilke criticized Plaintiff's officers' TEA's saying they had too much information in them when in the past Wilke had said her officers' TEA's did not have enough information. Wilke then questioned Plaintiff about a boating accident that took place while she was on leave and asked why Plaintiff had claimed 1.5 hours and why the CAD report had Plaintiff logged in for 4 hours. Plaintiff explained that that she had to work because there was an emergency and that she had handled it by the phone which is common practice for Lieutenants. Plaintiff told Wilke that she listed her correct hours on the time sheet for 1.5 hours.

41.   Approximately 10 minutes after Plaintiff's meeting with Wilke, Russel pulled her aside. Plaintiff reported to Russel at that time that Wilke was undermining her by going around the chain of command and directing her officers directly instead

of involving Plaintiff. Plaintiff reported she felt threatened and harassed by Wilke. Russel asked if he could handle Plaintiff's complaint at a regional level. Plaintiff said that he could not handle it at a regional level because she had already come to Russel on July 11, 2022 and he had not resolved her concerns. Russel claimed he had looked into her complaints and found nothing wrong. Plaintiff then used the word "violations" to describe Wilke's conduct and that changed Russel's tone. Plaintiff reported feeling threatened and harassed by Wilke. Plaintiff said she wanted to meet with Colonel Roger Young. Russel told Plaintiff that she was wrong about Young's open door policy, and that Plaintiff might be able to meet with Lieutenant Colonel Greg Eason. Plaintiff replied that Young had said in the regional meeting that Lieutenants and officers could call him directly if they were unhappy and wanted to meet with him. Russel again accused Plaintiff of denying Wilke a meeting with her. Plaintiff replied that she had never been insubordinate with Wilke and never had denied him a meeting- she had only asked for an FOP union representative to be present. Russel told Plaintiff again that she could not have an FOP representative present unless she was under an internal affairs investigation.

42. On August 10, 2022, Plaintiff met with Young and reported the harassment and gender discrimination she was experiencing under and by Wilke and reported she was being gaslighted by Russel. Young sent Plaintiff an email after the meeting and said he was working on rectifying the problems. He later told Plaintiff

that he wished he could have done more but that the attorneys told him to stay out of it.

43.    Plaintiff thereafter requested a transfer to any of the following positions: K9 Lieutenant, Recruiter Lieutenant, Extra Lieutenant in Boating and Waterways and for the computer section. Plaintiff was not transferred.

44.    On August 22, 2022 Plaintiff received an evaluation from Wilke through the People First platform without being given a call or email by Wilke. Wilke rated Plaintiff at a 3 out of 5 while in the past Plaintiff had always received 4's. Plaintiff called Wilke and asked if she met the criteria for 3 and Wilke said he stated that in his comments. Plaintiff told Wilke she should have received a 4 because of her Honor Guard, CISM, Smart Cop Power User, Praise an Employee, outreaches, youth indicates, training, and advances courses which she stated she listed on her Quartey Reports that she had turned in to him. Wilke claimed he would get back to Plaintiff and hung up.

45.    Wilke called Plaintiff back half an hour later and said after their discussion he bumped her to a 4 but that she deserved a 2 and he was being generous with the initial 3.

46.    On September 9, 2022, Plaintiff asked Young about a transfer. Plaintiff explained that Wilke and Russel could not even go 30 days without harassing her

and Plaintiff reported that Wilkes told her she deserved a 2 on her evaluation when there was no documentation to support it.

47.    Wilke called Plaintiff after her call with Young and told Plaintiff she had to meet with him and Russel the following Monday at 8:00 a.m.

48.    On September 10, 2022, Plaintiff emailed Wilke and asked for Human Resources (HR) to facilitate the Monday meeting and Wilke replied and said that was not necessary.

49.    On September 12, 2022, Plaintiff had her meeting with Wilke and Russel. Russel asked how he could make things better for Plaintiff. Plaintiff replied that he could remove her from Wilke's supervision and place her under Captain Robby Creech, because there were no other positions statewide that were available. Russel told Plaintiff that he heard about her evaluation from Young. Russel said that Wilke saying Plaintiff deserved a 2 for an evaluation is normal, which Plaintiff refuted and said that she did not deserve a 2.  Plaintiff reported that Wilke was treating her differently than male Lieutenants and provided some examples including when Wilke questioned Plaintiff about her ability to perform her duties with her workers compensation injury, and the threats he had made to demote her. Wilke then said he had offered Plaintiff the demotion on February 24, 2022, because she was emotional. Plaintiff replied that she was emotional on February 24, 2022, because she was undergoing testing for breast cancer. Plaintiff also reported to Russel that

Wilke was removing Plaintiff from the chain of command with her subordinates and was going directly to her officers or having another Lieutenant respond which undercut Plaintiff's ability to perform her job duties.

50.     On November 2, 2022, Plaintiff filed an internal complaint reporting gender discrimination in the workplace and submitted it to Lieutenant Colonel Brian Smith. Plaintiff reported that she has been targeted with negative evaluations, constantly talked down to, received unwarranted letters of oral counseling, repeated threats of demotions, scrutinized for her TEA Forms, and held to a different standard than other male Lieutenants. Plaintiff reported that Wilke singled her out for her workers compensation claim and questioned Plaintiff asking if she could perform her duties. Plaintiff reported that Lieutenant Ben Eason failed his Physical Agility test and he was not questioned about his ability to perform his duties. Plaintiff's complaint was not investigated and she was referred to the Florida Commission on Human Relations to file a complaint rather than investigating the reports.

51.     On November 15, 2022, Plaintiff had her Quarterly evaluation with Wilke where Captain Robby Creech, Akers, and Administrative Assistant Kelly Buchanan, were also present. During the meeting, Plaintiff was told she met expectations but needed to work on communicating with peer lieutenants. Plaintiff was also told she needed to improve messaging sent to the squad, work on building a team, work on developing subordinates, model leadership expectations as outlined

in her strategic plan, and work on ways to challenged officers and get them out of their comfort zones. Wilke also complained that Plaintiff was not covering North of SR 42 area in Lake County.

52.    Plaintiff told Wilke he was undermining her authority and making her job more difficult and that she had directed her new officer, Kyle Stamp, to learn his assigned patrol area and take ownership before leaving someone else's area. Plaintiff reported that Stamp told her he was asked by Wilke to work North of 42/Ocala Forest area and that he had submitted the TEA because he did not want to be insubordinate to Wilke. Wilke reprimanded Plaintiff for telling Stamp to learn his assigned area before working new areas. This is but one example of Wilke going around Plaintiff to make assignments to her subordinates which adversely affected Plaintiff's ability to perform her job duties.

53.    As for Wilke's complaint that Plaintiff was not covering North of SR 42, Plaintiff also researched the call history for service north of SR 42 and discovered that her officers covered more calls in that area than the squads under West and Edson.

54.    On November 28, 2022, West, who also reports to Wilke, told Plaintiff that he told his officer Marc Robinson not to be in the North Volusia area and to learn his area first. West made this statement to Officer Robinson in the presence of Wilke. Plaintiff told West she just received negative feedback from Wilke for saying

the same thing about Stamp. However, West was not reprimanded by Wilke for not allowing his officer to patrol North Volusia and North SE 42 in Lake County.

55.   On December 11, 2022, Wilke was riding with Plaintiff's officer William Teal which, again, was undermining Plaintiff's authority because Wilke was removing Plaintiff from the chain of command. Plaintiff told Teal to respond to a Wildlife Conflict call and to get Plaintiff bullets and the 24 hour accident incident form within an hour of being on the scene. Teal sent the wrong form. Plaintiff told Teal he sent the wrong form and then Teal then sent the correct form, but it was not completely filled out. Plaintiff told Teal to finish the form and get it back to her by the end of shift which Teal failed to do.

56.   The next day Plaintiff called Teal and later met with him in person. Teal said he was sorry but that he was being pulled in different directions. Plaintiff told Teal to keep her informed and that Plaintiff was his immediate supervisor and part of his chain of command. Teal told Plaintiff that Wilke calls him and gives him instructions.

57.   Because of the ongoing discrimination and harassment, on December 12, 2022, Plaintiff filed a charge of gender discrimination with the Equal Employment Opportunity Commission (EEOC) and the Florida Commission on Human Relations (FCHR).

58.     On January 5, 2023, Teal went to Wilke with an Out of State Request for Assistance. Wilke then reached out to all of Plaintiff's officers, again going around Plaintiff and undermining Plaintiff's authority.   Wilke did not do the same for male Lieutenants. Wilke rode with Plaintiff's officers on a regular basis but did not do the same for Male Lieutenants which further undermined Plaintiff's authority.

59.     On January 17, 2023, Plaintiff requested discipline for Teal for failing to follow direct orders and his chain of command. Plaintiff's claim was denied by Captain Barry Shaw who told Plaintiff her complaints were "petty and ridiculous."

60.     On January 18, 2023, Teal emailed Human Resources asking about his expired FMLA. The email should have gone to Plaintiff.

61.     On January 31, 2023, Wilke went over Plaintiff's Quarterly review and said Plaintiff met expectations but needed to continue to work on communication. Plaintiff told Wilke she called her fellow Lieutenants all the time and said she was communicating. Wilke criticized Plaintiff for taking 40 days to submit an operational plan. However, Plaintiff was not given a due date for her operational plan and had told Wilke he would receive the operation Plain in January.  He did not object or oppose Plaintiff's request/statement that the plan would be submitted in January.

62.     On February 10, 2023, Plaintiff reported to Captain Barry Shaw that Teal was investigating a felony armed trespass and did not discuss it with Plaintiff, did not file a report, had no call for service and then had asked for assistance from

the intelligence unit all while Teal was on FMLA leave. Shaw said Teal was going above and beyond. Plaintiff asked Shaw how Teal could investigate this incident without his chain of command knowing. Shaw said, "because he can." Shaw told Plaintiff there were minor violations and it appeared Plaintiff was targeting Teal. But the officers who reported to male Lieutenants followed their chain of command and reported investigations to their chain of command before asking for help from the intelligence unit.

63.     On February 10, 2023, Wilke met with Plaintiff to discuss an email he received from Captain Barry Shaw. Wilke said he was trying to help Plaintiff and asked Plaintiff if she believed him. Plaintiff said "no", she did not think Wilke was trying to help her and that he was out to get her and was undermining Plaintiff with her squad. Wilke asked Plaintiff about the January 18, 2023, Lieutenant/Captain meeting and asked Plaintiff where she was with an operation in Nichols Springs. Plaintiff said she assigned Officers Casey Phillips and Brandon Scrambling to the operation in Nichols Springs and that she planned to meet with them Monday to discuss it.

64.     Wilke insinuated Plaintiff was lying about the meeting with her officers because it was not confirmed until after the Lieutenant/Captain meeting. Plaintiff said she had scheduled to meet with her officers before the Lieutenant/Captain meeting. Wilke then said but at the meeting it was not confirmed and said, "If you

are lying about little things like setting up a meeting what else are you lying about." Plaintiff repeated that she had scheduled the meeting and Wilke countered that it was not confirmed.

65.     Wilke told Plaintiff he had discussed her with other Lieutenants, and it was weird or funny that Plaintiff went from doing nothing in the meeting to a meeting with her officers being scheduled. Plaintiff told Wilke that he had created a hostile work environment because he was talking about Plaintiff with her co-workers. Wilke then questioned Plaintiff about someone important calling from Sumter County and Plaintiff replied that no one had called. Wilke then asked Plaintiff the same question several times. Plaintiff asked if someone had complained, and Wilke shrugged his shoulders and did not answer. Plaintiff said, "if you are investigating me, I have a right to know." Wilke said he had a meeting with Regional Director Shannon Wright the following week and that he would see.

66.     On February 16, 2023, Wilke asked Plaintiff to come meet with him and Russel. Plaintiff asked what the meeting was about and Wilke said, "its a meeting" Plaintiff asked if she was in trouble and if the meeting involved discipline? Plaintiff also asked if she needed to bring representation. Wilke's responded in an agitated tone and said, "it's a meeting."

67.     On February 20, 2023, Plaintiff met with Wilke and Russel. Plaintiff asked if she could record the meeting but was denied by Russel who said he did not

want to start a practice of having meetings recorded. Russel told Plaintiff she was not under investigation, but he was concerned about the disciplinary documentation she had sent about Teal and said Teal's actions did not warrant discipline. Plaintiff replied that Teal was being insubordinate, skipping the chain of command, and that Wilke was encouraging it. Plaintiff reported three instances where Teal skipped the chain of command. Plaintiff said she was trying to use progressive discipline and that Teal was continuing in not communicating with her. Plaintiff reported that she had told Teal and all officers that she would be riding with them and that they all needed to improve communication and share work related information with Wilke and Plaintiff. Plaintiff told Wilke and Russel that she was working in a hostile work environment and was being targeted and treated differently. Plaintiff reported that a year prior, Teal told Plaintiff and fellow officers that Plaintiff was the best supervisor he had in the agency.

68. Wilke and Russell then discussed Wrights' concerns that Plaintiff did not tell Wilke that a homeowner had contacted Plaintiff. Plaintiff explained that she was ill with Covid-19 with 102 fever and that she had spoken to the homeowner and Chad Hughes (the other landowner). Plaintiff said she would assign Officer Brandon Scrambling when he returned from vacation because he would be working that area. Wilke and Russel told Plaintiff she was being counseled and not written up for failing to let Wilke know a homeowner had contacted her. Plaintiff said she was

unaware that she had to notify a Captain when a landowner contacted her and that going forward, she would always tell Wilke if landowners contacted her.

69.     Russel then admonished Plaintiff and said she needed to work on her communication. Russel told Plaintiff she was using an "argumentative tone" with Captain Barry Shaw and during her first Quarterly evaluation and that it was not acceptable. Plaintiff apologized and explained that Captain Barry Shaw called during her personal time when she was not working. Plaintiff explained that she was busy and should not have even answered the phone. Plaintiff said she was not argumentative she had simply said she didn't understand how Teal could work independently while on FMLA leave, off the books on a felony case and send out intelligence requests without having a CAD call, report and without notifying Plaintiff. Plaintiff said Teal's investigation went against the Investigation General Order. Plaintiff reported that Captain Barry Shaw had told her that the General Order does not apply to officers and that her complaints about Teal's behavior were "petty and ridiculous."

70.     Russel then said the conversation they were having that day was nice. Plaintiff agreed and told Russel about how Wilke sounded hostile when he said "it's a meeting." Wilke then accused Plaintiff of drawing a line in the sand and refusing to meet with him. Plaintiff replied that she never said she would not meet with Wilke- she simply did not want to meet with him alone and Plaintiff also said she

was never insubordinate. Plaintiff then told Russel "if you talk to me with respect, I have no issues." Russel then told Plaintiff that as a tool for moving forward and helping to improve Plaintiff's communication, he was requiring for her to attend a class at Valencia on Developing and Maintaining a Sound Organization. Russel then asked Plaintiff to reiterate a synopsis of the meeting. Plaintiff then summarized the meeting.

71.   On March 13, 2023, Plaintiff filed an additional charge of discrimination and retaliation with the EEOC and FCHR due to the ongoing harassment including acts of retaliation.

72.   On March 28, 2023, Wilke asked Plaintiff about Hughes and asked if Plaintiff received a picture of a tag from him. Plaintiff explained she had covid-19 when she spoke to Hughes and did not remember. Plaintiff said she spoke to Hughes but could not remember if he ever responded. Wilke said he had lunch with the large landowners and Hughes said he sent Plaintiff a picture. Plaintiff said she heard Lieutenant Asa Dias, received a picture but that she did not think she did. Plaintiff then showed Wilke her communication with Hughes and how she could not find a response from Hughes. Plaintiff asked Wilke to forward her the landowners' contacts from lunch and said she would reach out to them personally and share their information with her officers.

73.    Plaintiff received the landowners' contact information from Wilke and reached out to the landowners.

74.    On March 31, 2023, Plaintiff spoke with Hughes and Hughes told Plaintiff he received a call from Wilke after the landowner lunch and knew that Wilke had asked her if she received a picture from Hughes. Hughes apologized if he had started a rift with Plaintiff and Wilke and said that Teal responded and that he was satisfied with the customer service he received.  It became clear to Plaintiff that Hughes did not reply to her and Scrambling because he was already in contact with Teal and that Teal failed to tell her he was in contact with Hughes.

75.    On March 31, 2023, Plaintiff received an unfavorable evaluation from Wilke that rated her as not meeting expectations for her leadership. The evaluation rated her as meeting expectations for: Management, Professional excellence, and Member conduct. The evaluation said she needed to work on communicating with peer lieutenants for consistent messaging across the area, communicate clear messaging to the squad and others, keep working on building a strong team, provide direction and development of subordinates to ensure quality customer service, model leadership expectations as outlined in the strategic vision and framework, and work on ways to challenge officers' abilities getting them to excel outside their comfort zone. The evaluation falsely accused Plaintiff of being deceptive, antagonistic towards peers, and of not providing customer service in Sumter County. Plaintiff

filed a rebuttal to this evaluation in which she asserted that she has not been deceptive, that she communicates well with her peers, and that her officers provide customer service in Sumter County.

76.     On April 2, 2023, Wilke excluded Plaintiff from Chain of Command and emailed Teal directly without copying Plaintiff. Teal included Plaintiff in his reply to Wilke's email which is how Plaintiff was made aware of their correspondence.

77.     On April 4, 2023, Teal called Plaintiff and apologized for his behavior in the past year. Teal told Plaintiff that Russel had been to his house the past weekend and Teal told Russel Plaintiff was a good supervisor. Teal said he had been in a "funk" and needed his FMLA leave to reset. Teal said hopefully they could get back to working together. Plaintiff told Teal she had been consistent in 6-7 years of supervising him and that apologizing would go a long way towards improving their relationship.

78.     On April 12, 2023, Plaintiff received an email from Wilke about Shaw's TEA. Wilke told Plaintiff that prior to her approval of officers TEA's she must have shifts confirmed and must be scheduled with officers. Wilke criticized Plaintiff about Shaw's TEA and told her to take out assumptions and be factual, to state issues and make sure officers working on the TEA were available and planned to work on it. Wilke said in the email "These are all things Lieutenants should address at their

level." But male Lieutenants' officers' TEA's have missing names, varying shifts, not confirmed officers, assumptions and TEA's lasting for a month.

79.     On April 19, 2023 and May 10, 2023, Plaintiff filed additional charges of gender discrimination and retaliation with the EEOC and FCHR.

80.     Since Plaintiff filed charges of discrimination with the EEOC and FCHR, she was targeted for reprimands and termination. By way of example, Plaintiff has had her Quarterly progress reports marked down and she has been falsely accused of being untruthful, the kiss of death for a law enforcement officer.

81.     As of May 23, 2023, Plaintiff's emotional and physical health was suffering and she was in counseling.  At that point, she could not take the abuse from Wilke any longer and took an approximately $20,000 annual pay cut to $59,000 and was demoted to Investigator to be out of Wilke's supervision.

82.     On June 6, 2023, Plaintiff filed a grievance against Wilke for his 2022-2023 performance evaluation for Plaintiff and for his Quarterly Progress report on her. Plaintiff wrote that she disagreed with the ratings she was given under section 1.1 Leadership and Section 1.3 Professional Excellence. Plaintiff reported that she was given a 2 in Leadership and a 3 in Professional Excellence, both of which were considerably lower than her performance and lower than her male counterparts.

83.     Wilke's 2022-2023 performance evaluation for Plaintiff falsely claimed Plaintiff had not modeled Defendant's leadership expectations as defined in

strategic vision and framework and that she had failed to follow up with stakeholders to ensure Defendant was providing customer service. She received this evaluation in May, 2023, shortly before her demotion.  Plaintiff wrote in her grievance that she had followed up with stakeholders and investigated the complaint which met the leadership goals defined in the strategic vision framework. Plaintiff wrote that she provided Wilke with proof that she called, texted and emailed the stakeholder and that he did not reply. Plaintiff wrote that Scrambling and Teal also contacted Hughes and that Hughes said he had no issues with Plaintiff's customer service. Plaintiff wrote that her officers completed the Operational Plan with her assistance and that she had chosen two officers to challenge them, and that Wilke had praised her for selecting the two officers she did. Plaintiff wrote that Wilke had criticized her for taking 40 days to complete her Operational plan but that she had emailed Wilke on December 22, 2022, and said the Operational plan would be submitted in January 2023 and that Wilke did not reply. Plaintiff wrote that she was following the strategic vision by mentoring, encouraging and challenging her officers.

84.    Wilke's 2022-2023 performance evaluation for Plaintiff alleged that for Plaintiff's Professional Excellence rating that Plaintiff had not modeled ideal behaviors for subordinates to follow and that she had failed to conduct herself in a manner that reflected favorably upon the division while communicating with the division. Plaintiff wrote in her grievance that she met two of the three quarterlies and

that she received accolades for 2022-2023 year from stakeholders, officers and her command staff. Plaintiff wrote that any issues she had were directly related to her EEOC and FCHR complaint of gender bias, targeting and retaliation. Plaintiff wrote that Wilke spoke to her with distain on several occasions. Plaintiff wrote that she had discussed her demeanor with Captain Shaw and during her first quarterly meeting and that she had reported she was working in a hostile work environment and was being harassed and targeted. Plaintiff wrote that she questioned Captain Shaw and was not being argumentative because she did not understand how the General Orders did not always apply to officers. Plaintiff wrote she apologized to Captain Shaw for being short with him but that she just did not understand how Defendant will allow an officer to investigate a felony without their supervisor's knowledge, while on leave, without a CAD call or ISR and then have them release a photo externally for help to identity without any documentation or communication with his direct supervisor, Plaintiff. Plaintiff wrote that Teal was going directly to Wilke instead of her and she had counseled him twice to follow chain of command and keep her in the loop and that Wilke encouraged Teal's behavior.

85.    On October 3, 2023, Plaintiff filed an additional charge of gender discrimination and retaliation with the EEOC and FCHR.

86. On October 12, 2023, Wilke transferred to the Investigation Section where he is now Plaintiff's supervisor again. She essentially took a demotion for nothing.

87. Since her demotion, the following has occurred: her pictures on the wall within the Fish Lab office located in Eustis have been removed and/or she has been cut out of pictures, she has been criticized for wearing clothing that she was permitted to wear and taken to clothing stores by a male coworker to find a shirt that they could not find, she was criticized for not wearing gloves when other senior officers were not wearing gloves, and has been belittled by a coworker in the presence of supervisors with no remedial action taken thereafter.

88. Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendant should be made to pay said fee under the laws referenced above.

## COUNT I
## GENDER DISCRIMINATION

89. Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90. This is an action against Defendant for discrimination based upon gender.

91. Plaintiff has been the victim of discrimination on the basis of Plaintiff's gender in that Plaintiff was treated differently than similarly situated employees of

Defendant who are male and has been subject to disparate and poor treatment on the basis, at least in part, of Plaintiff's gender.

92.     Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

93.     Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

94.     Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

95.     In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a gender-based nature and in violation of the laws set forth herein.

96.     The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein led, at least in part, to Plaintiff's demotion and other actions set forth above.

97. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon gender.

98. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief.

## COUNT II
## RETALIATION

99. Paragraphs 1 through 88 are realleged and incorporated herein by reference.

100. Defendant is an employer as that term is used under the applicable statutes referenced above.

101. The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting her.

102. The foregoing unlawful actions by Defendant were purposeful.

103. Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and was the victim of retaliation thereafter, as related in part above.

104.   Plaintiff is a member of a protected class because she reported unlawful employment practices and was the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter including without limitation her demotion.

105.   As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages are continuing and are permanent.  Plaintiff is entitled to injunctive relief.

## COUNT III
## HOSTILE WORK ENVIRONMENT

106.   Paragraphs 1 through 88 are realleged and incorporated herein by reference.

107.   This is an action against Defendant for discrimination based upon gender.  This is a claim for hostile work environment.

108.   Plaintiff has been the victim of a hostile work environment based on her  gender.  She belongs to a protected group as she is a female.  She was subject to unwelcome harassment during her employment with Defendant as set forth above. The harassment was based on her protected characteristic, i.e., her gender.  The

harassment was sufficiently severe or pervasive to alter the conditions of her employment and the Defendant is responsible for the hostile work environment. After reporting the hostile work environment, Defendant did nothing but tell her to file a complaint with FCHR and allow the harassment to continue.  Plaintiff was forced to demote and in further retaliation, reassigned Wilke over her after Defendant knew she demoted to get out from under Wilke's supervision.

109.   Defendant is liable for the hostility towards Plaintiff and her demotion because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff but, in fact, exacerbated the harm to Plaintiff by exiling her, going around her to give assignments to her subordinates, falsely accusing her of not performing her job duties, forcing her to demote and accusing her of being untruthful.  Furthermore, Defendant knowingly condoned and ratified the hostile environment as more fully set forth above because it allowed it and participated in same.

110.   Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

111.   In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were based on Plaintiff's gender and in violation of the laws set forth herein. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant. The events set forth herein lead, at least in part, to adverse actions against Plaintiff and to actions that adversely affected Plaintiff's to perform her duties, as set forth above.

112.   Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon gender.

113.   As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive/equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a)   that process issue and this Court take jurisdiction over this case;

(b)      that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)      enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)      enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)      enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)      award Plaintiff interest where appropriate; and

(g)      grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 07396875]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to all counsel of record by CM/ECF this 5th day of July, 2024.

/s/ Marie A. Mattox
Marie A. Mattox